PROTANE GAS CO. OF PUERTO RICO, INC., and PROTANE GAS OF CAGUAS, INC., Plaintiffs and Appellees, *v.* SANTIAGO RAMOS, Defendant and Appellant.

No. AP-66-30.     Decided November 15, 1967.

*Gregorio Ramos Rivera* for appellant. *Norman A. Pardo* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RIGAU delivered the opinion of the Court.

The plaintiff companies requested and obtained from the Superior Court, Caguas Part, a permanent restraining order

against appellant ordering him to desist from intervening with the installations, property of one of the plaintiffs, which the latter has in Caguas and "adjacent areas." Appellant requests this Court to reverse and set aside the judgment of the trial court because he believes that it violates his constitutional right to make contracts and to engage in a lawful commercial activity. He also argues that the judgment appealed from is contrary to the public policy of Puerto Rico as expressed in the Act to prohibit monopolistic practices and protect fair and free competition in trade and commerce. Act No. 77 of June 25, 1964, 10 L.P.R.A. § 257 et seq.

Plaintiffs are engaged in the sale and distribution of kitchen appliances and of propane-butane gas in metal cylinders. Said gas is used for cooking. In order to carry the gas from the cylinders, which are installed in the houses or wherever the users choose, to the stoves, it is necessary to install pipes and a pressure control valve. Consumers purchase the gas but not the cylinders. The supplier takes away the empty cylinder each time he replaces it with a full one. The company leaves the cylinders, the pipes and the pressure control valve with the consumer. When the installation is made the consumer signs a printed contract of "Loan of Equipment" which is furnished by the company for that purpose. In one of its thirteen numbered paragraphs the contract states as follows:

"The consumer will not use the loaned equipment for a different purpose than the one for which they were lent nor will he use them for buying gas from any other person but the Company, and he should return them to the Company within a term of not more than 10 days in case he stops using them for any cause other than the Company's fault."[1]

---

[1] Cf. as to adhesion contracts Maryland Cas. Co. v. San Juan Racing Association, 83 P.R.R. 538, 545 (1961); Zequeira v. U.R.H.C., 83 P.R.R. 847, 849 (1961); Barreras v. Santana, 87 P.R.R. 215, 220 (1963).

Defendant was first employee and later an executive of one of the plaintiffs for approximately a year and a half until he left the company, and established his own business, for the sale of fluid gas, in competition with plaintiffs. Plaintiffs had, at the time of the suit, some 10,400 clients in Caguas. Defendant sells, or sold at the time of the litigation, to different consumers including a number of those who have installations in their homes belonging to plaintiffs.

Plaintiffs argue that defendant, by reason of his employment with one of them, had access to its records and to the names and addresses of its clients, and that upon selling gas to those clients he commits an unfair practice and unlawful use of confidential information of plaintiffs.

Neither from the facts found proved by the trial court, nor from the record does it appear that defendant took possession of any list of clients. It is likely and even probable, that defendant had learned the business or part of the business of selling and distributing fluid gas as a result of his work with one of the plaintiffs. That happens whenever a person works for any person or enterprise. The learning process which is simultaneous with the exercise of any trade or profession is inevitable and we cannot see how it might be prohibited. Plaintiffs do not have a franchise granting a monopoly in Caguas, or outside Caguas, for the sale of fluid gas. Monopolies are not assumed or favored. Neither the positive law of Puerto Rico, nor the public policy of which positive law is the best indication, nor law, nor economics favor monopolies.[2] These are only justified, by way of ex-

---

[2] Act No. 77 of June 25, 1964; 10 L.P.R.A. § 257 *et seq.*; 15 U.S.C. §§ 1–40; Williams, *"Distribution and the Sherman Act,"* 1967 Duke L.J. 732; Von Kalinowski, *"The Per Se Doctrine—An Emerging Philosophy of Antitrust Law,"* 11 U.C.L.A. L. Rev. 569 (1964); Krasnow, *"Implications of Brown Shoe Co. v. United States on the Law of Mergers,"* 23 Fed. B.J. 225 (1963); Hanson and Von Kalinowski, *"Symposium: Trade Regulation—The Status of State Antitrust Laws with Federal*

ception, when geographical, populational, and economic circumstances or when the nature of the service to be rendered or the product to be sold are such that a community is better served by a monopoly than by the absence of one.[3]

■ What happens in this case is that some of plaintiffs' clients breached the contract of loan of equipment signed with them. The defendant was not a party to those contracts and therefore said contracts are not binding upon him. Sections 1209 and 1211 of the Civil Code; 31 L.P.R.A. §§ 3374 and 3376. Said contracts of loan are, specifically, commodatum contracts, § 1631 of the Civil Code; 31 L.P.R.A. § 4511. The contractual relation created by them connects only the bailor company and the bailees.[4] Probably in those cases in which the bailees use the installations property of plaintiffs for purposes other than those permitted by the commodatum, the latter may claim said installations but said contracts cannot support an injunction forbidding a third person, plaintiff herein, to sell fluid gas to those consumers. As we stated

---

*Analysis,"* 15 W. Res. L. Rev. 9 (1963); *"Antitrust and the Common Market—A Symposium."* Some articles on different aspects by Helmut Coing, Wilbur L. Fugate, George Nebolsine, and others, 38 N.Y.U. L. Rev. 435 (1963); Walden, *"Antitrust in the Positive State,"* 41 Texas L. Rev. 741 (1963) Part I and in 42 Texas L. Rev. 603 (1964) Part II; Schapiro, *"The German Law Against Restraints of Competition—Comparative and International Aspects,"* 62 Colum. L. Rev. 1 (1962); Rahl, *"Symposium on Price Competition and Antitrust Policy,"* 57 Nw. U.L. Rev. 137 (1962); Loevinger, *"The New Frontier in Antitrust,"* 39 Texas L. Rev. 865 (1961); Sieker, *"The Role of the States in Antitrust Law Enforcement—Some Views and Observations,"* 39 Texas L. Rev. 873 (1961); Stern, *"A Proposed Uniform State Antitrust Law: Text and Commentary on a Draft Statute,"* 39 Texas L. Rev. 717 (1961); Rahl, *"Toward a Worthwhile State Antitrust Policy,"* 39 Texas L. Rev. 753 (1961); Handler, *"Recent Antitrust Developments,"* 71 Yale L.J. 75 (1961); Friedmann, *"Freedom of Trade and Policy,"* Chap. 8 of "Law in a Changing Society" (1959); Carlston, *"Anti-Trust Policy,"* 60 Yale L.J. 1073; Report of the Attorney-General's Committee to study Anti-Trust Laws, 1956.

[3] For examples of public monopolies, see article *Monopolies, Public* in X Encyclopaedia of the Social Sciences 619 (1962).

[4] See §§ 1632–1643 of the Civil Code; 31 L.P.R.A. §§ 4521–4554.

412

before, it is against their clients and bailees that the plaintiffs may act and not against their competitor.

For the reasons stated, the judgment of the Superior Court, Caguas Part, rendered in this case will be reversed.